FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2011 JUN 16 A 11: 22

CLERK'S OFFICE
AT BALTIMORE

BY_____DEPUTY

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

UNITED STATES OF AMERICA,         *

    Plaintiff,                  *

v.                                 *   Criminal No.: WDQ-10-0114

JONATHAN A. MELENDEZ,              *

    Defendant.                  *

    *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

MEMORANDUM OPINION

Jonathan Melendez is charged with conspiracy to distribute and possess with intent to distribute cocaine in violation of 21 U.S.C. § 846, and possession with intent to distribute cocaine in violation of 21 U.S.C. § 841. For the following reasons, Melendez's motion to suppress tangible evidence and statements will be denied.

I. Background

On March 9, 2010, Maryland State Police Trooper Jeremiah Gussoni saw a 2010 Dodge Avenger with Massachusetts license plates exceed the speed limit on Interstate 95 in Cecil County, Maryland. Supp. Hr'g Tr. 4-5, 9.[1] Gussoni waited for the car to pass him, and pursued it. *Id.* 11. The car slowed to about 40

---

[1] The Dodge Avenger was traveling in the middle northbound lane and sped past traffic in the right and left lanes. Supp. Hr'g Tr. 9. Using a LIDAR laser unit, Gussoni determined that the car was traveling at 76 miles per hour. *Id.*

miles per hour, and pulled into the right lane cutting off another driver. *Id.* 11-12. Gussoni activated his emergency lights and stopped Melendez's car at about 1:02 p.m. *Id.* 11-12. When Gussoni activated the lights, his dashboard camera began recording the stop. *Id.* Gussoni told Melendez that the stop was being recorded and asked for his driver's license and registration. *See* Govt's Supp. Hr'g Ex. 1 at 13:02-13:03.

Gussoni saw that Melendez was extremely nervous, his carotid artery was pounding, and he would not look directly at Gussoni. Supp. Hr'g Tr. 14. Melendez gave Gussoni a New Jersey driver's license and a one-way car rental agreement from National Car Rental. *Id.* 15-16.[2] Melendez's hand trembled and the paper shook as he handed Gussoni the rental agreement. *Id.* 14-15.[3]

---

[2] The rental agreement showed that the car had been rented at Fort Lauderdale International Airport in Florida, and was scheduled to be returned in New York City. *Id.* 16. Gussoni testified that Florida is a "source location" and New York City is a "source destination," meaning that many narcotics shipments enter the country in Florida and are transported to New York. *Id.* 23.

[3] Although Gussoni's observations about Melendez's carotid artery, failure to make eye contact, and trembling are not evident on the video of the traffic stop, the Court accepts Gussoni's uncontroverted testimony as true.

2

Gussoni noted that the car had a "lived-in look"[4] with partially consumed food, a snack wrapper, and a coffee cup on the passenger's side floor board, and another coffee cup, small roll of money, and cigarettes in the center console. *Id.* 17. There was a small piece of luggage on the back seat, which had a newly issued airline sticker from Fort Lauderdale International Airport. *Id.* 19-20.

Gussoni asked Melendez to leave the car because he was having difficulty hearing him. When Melendez stepped out of the car it appeared that he was trying "to hold his chest in" to avoid "show[ing] that he was breathing so fast." *Id.* 21.[5] Gussoni told Melendez that he only planned to issue him a warning. *Id.* Melendez "came to attention and rendered [Gussoni] a salute," saying that ten years ago, he had been a

---

[4] At the suppression hearing, Gussoni testified that "lived-in look" is a law enforcement term that refers to one of the National Highway Transportation Safety Administration's 114 criminal indicators. *Id.* 18. A car with a "lived-in look" may indicate criminal activity because it shows that the driver may not want to leave the car because it may contain large amounts of money, drugs, or weapons. *Id.*

[5] Melendez's quickened breathing appears evident on the video of the traffic stop. *See* Govt's Supp. Hr'g Ex. 1 at 13:03:00 - 13:05:30.

3

police officer in his country. *Id.*[6] Gussoni asked Melendez to submit to a pat down for weapons and Melendez agreed. *Id.* 22.

At approximately 1:04 p.m., Gussoni returned to his car and inspected Melendez's driver's license, which he thought might be fake. *Id.* 24.[7] Gussoni called Trooper McCurdy for back-up because she was nearby and had a narcotics dog. *Id.* At about 1:05 p.m., Gussoni called dispatch for license and warrant checks on Melendez. *Id.*

After calling dispatch, Gussoni spoke with Melendez again. He asked Melendez how he had traveled to Florida, and Melendez said that he had rented another car to drive there and visit his brother. *Id.* 26. Melendez said that because he had planned to stay with his brother for two days, he had returned the first car, and picked up the Dodge Avenger to drive back to New Jersey. *Id.* 26-27.[8] Gussoni asked Melendez if he had any weapons or drugs in the car. *Id.* 27-29. Melendez said no, and appeared to Gussoni to be about to cry or pass out. *Id.* 29.

---

[6] Gussoni has stopped 50 to 75 police officers for traffic violations, and this was the first time an officer or former officer had saluted him during the stop. Supp. Hr'g Tr. 21-22.

[7] The license was not fraudulent. *Id.* 37.

[8] Gussoni testified that drug traffickers commonly fly to a source location and drive a one-way rental car back to the source destination. *Id.* 27. He suspected Melendez had done this because his story about driving to Florida was inconsistent with his luggage bearing a newly issued Fort Lauderdale International Airport luggage tag. *Id.*

4

Gussoni had not received the results of the license and warrant checks. *Id.* 30.

Gussoni signaled to Trooper McCurdy, who had arrived at about 1:08 p.m., and she conducted a K-9 scan of Melendez's car. *Id.* 27-30. The dog alerted to the odor of narcotics. *Id.* 30. The officers searched the car and recovered from the trunk a duffel bag containing 13 kilograms of cocaine. *Id.* Melendez was arrested and transported to Maryland State Police barracks, where he waived his *Miranda* rights. Govt's Opp'n 3-4. Melendez agreed to speak with officers, and signed a written statement that he had transported cocaine in his car. *Id.* at 4; Def.'s Mot., Ex. A.

On March 16, 2010, the grand jury indicted Melendez for conspiracy to distribute and possess with intent to distribute 5 kilograms or more of cocaine in violation of 21 U.S.C. § 846, and possession with intent to distribute 5 kilograms or more of cocaine in violation of 21 U.S.C. § 841. ECF No. 11. On March 31, 2010, Melendez pled not guilty. ECF No. 13. On May 13, 2011, he moved to suppress all tangible evidence and statements. ECF No. 22. A suppression hearing was held on June 13, 2011; the entire video of the traffic stop was played at the hearing.

II. Analysis

Melendez argues that the cocaine and statements should be suppressed because Gussoni lacked probable cause for the traffic

5

stop, and if the initial stop was reasonable, it lasted unreasonably long. Def.'s Mot. 3-5. The Government argues that Gussoni had probable cause for the stop, and his contact with Melendez justified the stop's duration. Govt's Opp'n 4-6.

The "[t]emporary detention of [an] individual[] during the stop of an automobile by the police . . . constitutes a 'seizure'" under the Fourth Amendment, no matter how brief the encounter. *Whren v. United States,* 517 U.S. 806, 809 (1996). "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Id.* at 810.[9]

Gussoni had probable cause to justify the initial stop. Using the LIDAR laser unit, Gussoni determined that Melendez was driving 76 miles per hour, 11 miles over the posted speed limit.[10] He also saw Melendez sharply decrease his speed, and

---

[9] "[A] prolonged automobile stop requires either the driver's consent or a 'reasonable suspicion' that illegal activity is afoot." *United States v. Branch,* 537 F.3d 328, 336 (4th Cir. 2008). Reasonable suspicion is a "commonsensical proposition," and a court is "not remiss in crediting the practical experiences of officers who observe, on a daily basis, what transpires on the street." *United States v. Lender,* 985 F.2d 151, 154 (4th Cir. 1993). Reasonable suspicion does, however, require "a minimum level of objective justification for the police action" and "demands more than an officer's inchoate and unparticularized suspicion or hunch that criminal activity is afoot." *United States v. Newland,* 246 Fed. Appx. 180, 187-88 (4th Cir. 2007)(internal quotation marks and citations omitted).

[10] "Observing a traffic violation provides sufficient justification for a police officer to detain the offending

6

veer into the right lane, cutting off another driver. Thus, the initial stop was reasonable,[11] and at that moment, Gussoni had sufficient justification to detain Melendez for the time needed "to perform the traditional incidents of a routine traffic stop." *Branch*, 537 F.3d at 335.

Gussoni performed those "traditional incidents," requesting, in accordance with Maryland State Police protocol, a license and warrant checks on Melendez.[12] He also requested a K-9 officer, and while he waited for the results of the license and warrant checks, Gussoni had Trooper McCurdy conduct the K-9 scan.[13] The scan was completed about eight minutes after the stop was initiated, and before the license and warrant checks were returned. Gussoni testified that protocol required him to wait for the license and warrant results before issuing a citation and allowing a driver to return to the road. Thus, the

---

vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." *Branch*, 537 F.3d at 335.

[11] *See United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993 ("When an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle.").

[12] During a routine stop, "an officer may request a driver's license and vehicle registration, run a computer check, and issue a citation." *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004).

[13] The officer may also perform a K-9 scan, which is not a search within the meaning of the Fourth Amendment, if done within "the time reasonably required" to issue a citation. *Illinois v. Caballes*, 543 U.S. 405, 408-09 (2005).

7

K-9 scan, performed before Gussoni could have issued Melendez a warning, was done within an "entirely reasonable duration for a routine traffic stop." *United States v. Batista,* 2011 WL 1636401, at *3 (D. Md. Apr. 27, 2011) ("Several circuits, including the Fourth Circuit, have upheld routine stops that have lasted fifteen minutes or longer.").

Even if the K-9 scan had not been performed within a reasonable duration for a routine traffic stop, Gussoni had reasonable suspicion that Melendez was engaged in drug trafficking before the scan was performed, and would have been justified in prolonging the initial stop to investigate further.

As Gussoni testified at the suppression hearing, when he stopped Melendez he saw several criminal activity indicators that he had been trained to identify. Melendez was extremely nervous. He was shaking and breathing rapidly. He was driving a rental car pursuant to a one-way agreement on Interstate 95, a "major thoroughfare for narcotics trafficking." *Newland,* 246 Fed. Appx. at 188. Melendez was traveling from a "source location" to a "source destination," and his car had a "lived-in look." Melendez's story about visiting his brother was inconsistent with the airline tags on his luggage, and he gave Gussoni a full salute when he exited the car.

Individually, each of these factors would not demonstrate reasonable suspicion that Melendez was engaged in criminal

8

activity. But under the totality of the circumstances, it was reasonable for Gussoni to suspect that Melendez was trafficking drugs; this reasonable suspicion justified a prolonged detention to investigate.[14] The traffic stop and its duration were reasonable. Melendez's motion to suppress will be denied.

III. Conclusion

For the reasons stated above, Melendez's motion to suppress will be denied.

_____6/15/11_____
Date

_____/s/ William D. Quarles_____
William D. Quarles, Jr.
United States District Judge

---

[14] See Newland, 246 Fed. Appx. at 188-89 (officer had reasonable suspicion of criminal activity that justified continued detention when it appeared the defendant's license was fake, the defendant was extremely nervous, there were multiple cell-phones in the car, and the defendant drove a rental car on a known drug trafficking route).